Filed 7/30/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| BRISTOL-MYERS SQUIBB COMPANY,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF SAN FRANCISCO COUNTY,<br><br>        Respondent,<br><br>BRACY ANDERSON, et al.,<br><br>        Real Parties in Interest. | A140035<br><br>(San Francisco County<br> Super. Ct. J.C.C.P. No. 4748) |

This case calls upon us to decide whether California has personal jurisdiction over a non-resident corporate defendant on unique facts. Defendant Bristol-Myers Squibb Company (BMS) has been sued by dozens of California residents in a coordinated proceeding before the San Francisco Superior Court. They allege defects in Plavix, a drug BMS manufactures and sells throughout the country. Jurisdiction over BMS as to these plaintiffs is conceded. The question presented is whether California also has jurisdiction over BMS regarding identical Plavix defects claims brought by hundreds of non-resident co-plaintiffs, the real parties in interest here (RPI), in the same coordinated proceeding, consistent with the Due Process Clause of the Fourteenth Amendment.

BMS moved below to quash service of the summons regarding the RPI's complaints for lack of personal jurisdiction. The RPI argued that California has jurisdiction over BMS, whether it be general, that is, jurisdiction over claims unrelated to the forum state, or specific, that is, jurisdiction based upon the relationship of the RPI claims, BMS, and California. The trial court denied BMS's motion based on its

1

conclusion that California has general jurisdiction over BMS, and did not address the issue of specific jurisdiction.

BMS filed a petition for writ of mandate in this court to reverse the trial court's ruling. We summarily denied this petition. However, on the same day that we did so, the United States Supreme Court issued *Daimler AG v. Bauman* (2014) ___ U.S. ___ [134 S.Ct. 746] (*Daimler*), which limited the application of general jurisdiction under the Fourteenth Amendment. Our own Supreme Court then granted BMS's petition for review and transferred the matter back to us for further consideration. Upon our review of the parties' further briefing and *Daimler*, we conclude California does not have general jurisdiction over BMS based upon the facts of this case.

This does not end our inquiry, however. Although the trial court did not address the issue of specific jurisdiction, we do so now because the underlying facts we rely upon are undisputed. In order to resolve this issue, we apply the time-honored test for the application of specific jurisdiction adopted by the United States Supreme Court in *International Shoe Co. v. Washington* (1945) 326 U.S. 310, 316 (*International Shoe*) and reaffirmed by it and the California Supreme Court over the past 65 years in order to determine whether such jurisdiction is consistent with the traditional conception of " 'fair play and substantial justice.' " (*Daimler*, *supra*, 134 S.Ct. at p. 754.) Having done so, we conclude that BMS has engaged in substantial, continuous economic activity in California, including the sale of more than a billion dollars of Plavix to Californians. That activity is substantially connected to the RPI's claims, which are based on the same alleged wrongs as those alleged by the California resident plaintiffs. Further, BMS does not establish it would be unreasonable to assert jurisdiction over it. Therefore, we conclude that it is consistent with due process to require BMS to defend the RPI's claims before the trial court in coordination with the claims of the California resident plaintiffs. Accordingly, we affirm the trial court's order denying the motion to quash based upon the doctrine of specific jurisdiction.

## BACKGROUND

### *Trial Court Proceedings*

On March 12, 2012, eight separate complaints, each including California residents and non-residents as plaintiffs, were filed in the San Francisco Superior Court by or on behalf of 659 individuals, consisting of 84 California residents and 575 non-residents (the RPI), who allegedly were prescribed and ingested Plavix. They (or their spouses) claim that they suffered adverse consequences as a result. Each complaint contains the same 12 causes of action.[1] The two named defendants in each of these cases are McKesson Corporation (McKesson), which is alleged to be a pharmaceutical distribution and marketing company organized under Delaware law and headquartered in San Francisco, and BMS, which is alleged to be a pharmaceutical manufacturing and marketing company that makes and markets Plavix throughout the United States, organized under Delaware law and headquartered in New York.

Each of the complaints alleges in identical terms that defendants introduced Plavix in 1997 and heavily marketed it directly to consumers by falsely representing it "as providing greater cardiovascular benefits, while being safer and easier on a person's stomach than aspirin." According to the complaints, defendants knew that those claims were untrue and that ingesting Plavix involved "the risk of suffering a heart attack, stroke, internal bleeding, blood disorder or death [which] far outweighs any potential benefit."

On April 11, 2012, prior to being served with seven of these eight cases, BMS removed them to federal court. They were all remanded on August 10, 2012.

---

[1] Strict Products Liability; Strict Liability—Manufacturing Defect; Negligence; Breach of Implied Warranty; Breach of Express Warranty; Deceit by Concealment—Civil Code sections 1709, 1710; Negligent Misrepresentation; Fraud by Concealment; Violation of Business and Professions Code section 17200; Violation of Business and Professions Code section 17500; Violation of Civil Code section 1750; Loss of Consortium.

On September 27, 2012, BMS filed motions to quash service of the summons regarding the complaints, but not with respect to the California resident plaintiffs.[2] The plaintiffs began discovery regarding these motions.[3] Meanwhile, pursuant to Code of Civil Procedure section 404.3 and rule 3.540 of the California Rules of Court,[4] Chief Justice Cantil-Sakauye, as Chair of the Judicial Council, authorized the presiding judge of the superior court to assign the eight San Francisco cases, with another, to a coordination trial judge, which the presiding judge did on April 25, 2013.

BMS was permitted to refile a consolidated motion to quash with respect to the RPI, which it did on July 9, 2013. In this motion, BMS noted in passing that "[the RPI] cannot invoke specific jurisdiction here because it is limited to cases where the 'controversy is related to or arises out of [the] defendant's contacts with the forum,' " citing *DVI, Inc. v. Superior Court* (2002) 104 Cal.App.4th 1080, 1089. Its principal argument, however, was that, under the recent decision of the United States Supreme Court in *Goodyear Dunlop Tires Operations, S.A. v. Brown* (2011) ___ U.S. ___ [131 S.Ct. 2846] (*Goodyear*), the trial court could not assert general jurisdiction over BMS unless BMS were "at home" in California. According to BMS, its California contacts did not rise to that level since it was neither headquartered nor incorporated here. BMS also argued, relying on factors that apply in a specific jurisdiction inquiry, that it would

---

[2] BMS's petition acknowledges that the facts developed in the trial court with respect to BMS's California contacts "may be sufficient to vest *specific* personal jurisdiction over BMS" as to the 84 resident plaintiffs' claims. In subsequent briefing and oral argument, BMS has conceded that California has jurisdiction over it with respect to their claims.

[3] The petition tells us that "[a]nother 40 actions involving 2,363 plaintiffs have been filed in San Francisco Superior Court." At oral argument, counsel for BMS advised us that if the multi-district litigation (MDL) cases are remanded to the San Francisco Superior Court, there will be 251 California resident plaintiffs and 3,519 non-California resident plaintiffs. Counsel for the RPI did not take issue with those numbers. Those MDL cases and plaintiffs are not presently before us.

[4] Unless otherwise noted, further statutory references are to the Code of Civil Procedure.

4

violate principles of fair play and substantial justice to require that it defend against the RPI's claims here.

The RPI responded that BMS's extensive contacts with California supported the assertion of general jurisdiction under leading cases such as *Buckeye Boiler Co. v. Superior Court* (1969) 71 Cal.2d 893, 898-899. They pointed out the factual differences between the present case and *Goodyear* and argued that *Goodyear* did not disturb precedent that warranted an exercise of personal jurisdiction here. They also argued that specific jurisdiction is appropriate when a defendant has purposefully directed its activities at residents of the forum and the litigation results from alleged injuries that "arise out of *or* relate to" those activities, citing *Burger King Corp. v. Rudzewicz* (1985) 471 U.S. 462, 472 (*Burger King*) and *Helicopteros Nacionales de Columbia, S.A. v. Hall* (1984) 466 U.S. 408, 414 (*Helicopteros*), and that the multi-factor "reasonableness" test set out in *Asahi Metal Industry Co. v. Superior Court* (1987) 480 U.S. 102 (*Asahi*)[5] weighed in favor of finding specific jurisdiction over BMS as to the claims of the RPI here.

BMS reargued the importance of *Goodyear* in its reply. It also cited *Spirits, Inc. v. Superior Court* (1980) 104 Cal.App.3d 918, 926 for the proposition that specific jurisdiction cannot be asserted "where neither the injury nor the conduct that led to it have a substantial relationship to California."

On September 23, 2013, the trial court heard argument on BMS's motion to quash, the matter was submitted, and the court denied the motion. In a subsequent written order, the court, relying heavily on *International Shoe*, *supra*, 326 U.S. 310, and *Hesse v. Best Western International, Inc.* (1995) 32 Cal.App.4th 404, concluded that a defendant's wide-ranging, systematic, and continuous contacts with a forum state justify the exercise of general jurisdiction over it. The court held that California had general jurisdiction over BMS because it had sold in the state nearly $1 billion worth of Plavix between 2006 and 2012 and 196 million Plavix pills between 1998 and 2006, had been registered with

---

[5] We discuss this test in more detail in section II.D., *post*.

the California Secretary of State to conduct business since 1936, maintained an agent for service of process in Los Angeles, operated five offices in California that employed approximately 164 people, employed approximately 250 in-state sales representatives, owned a facility in Milpitas employing 85 people that was used primarily for research, operated other facilities that were used primarily for research and laboratory activities in Aliso Viejo, San Diego and Sunnyvale, and had a small office in Sacramento that was used by the company's Government Affairs group.

The court did not directly address the question of whether, as the RPI argued in the alternative, BMS is amenable to suit in California under the doctrine of specific jurisdiction. However, as we will see, the court's references to BMS's extensive activities in California, its enjoyment of the benefits and protections of its laws, and the exercise of jurisdiction comporting with " ' "traditional notions of fair play and substantial justice" ' " (*International Shoe*, *supra*, 326 U.S. at p. 316) are entirely consistent with a finding that specific jurisdiction is appropriate.

### *The Present Writ Proceedings*

BMS filed the pending writ petition on October 22, 2013. After review of the RPI's verified preliminary opposition and BMS's reply, we summarily denied the petition on January 14, 2014—the same day that the United States Supreme Court announced its decision in *Daimler*. BMS promptly sought review in the California Supreme Court, relying principally upon *Daimler* and *Goodyear*.

On February 26, 2014, the court granted that petition and transferred the matter back to us with directions to vacate our prior order and issue an order to show cause why the relief sought should not be granted. We did so on March 13, 2014. The RPI filed their verified opposition, but not a formal return, on March 28, 2014. BMS filed its traverse on April 14, 2014, in which it points out that no formal return including a verified answer was filed. It argues that the opposition was not effective to deny the factual allegations of the petition, citing, among others, Eisenberg et al., California Practice Guide: Civil Appeals and Writs (The Rutter Group 2014) paragraph 15:223 at page 15-96.14. However, BMS's legal conclusions have not been admitted. And, to the

6

extent that the facts were effectively denied in the RPI's verified preliminary opposition and opposition, we exercise our discretion to treat those facts as denied.[6]

We granted leave for the Chamber of Commerce of the United States of America to file an amicus curiae brief in support of BMS's petition. The RPI did not respond, but the Consumer Attorneys of California and the American Association for Justice subsequently filed unopposed applications for leave to file amicus briefs in support of the RPI, which we also granted. BMS filed a response to those amicus briefs on June 9, 2014. Prior to oral argument, we asked the parties to focus their presentations on certain questions related to whether or not the lower court could exercise specific jurisdiction over BMS under the unique circumstances of this case. The parties did so at oral argument, which took place on June 17, 2014, and the matter was submitted.

## DISCUSSION

### I. *General Jurisdiction*

BMS argues that *Daimler* makes clear the trial court erred in concluding it had general jurisdiction over BMS. We agree.

A. ***The Origins of the Modern Jurisprudence Regarding Personal Jurisdiction***

We begin our analysis of personal jurisdiction with a review of the two seminal cases for our modern jurisprudence on the subject, *Pennoyer v. Neff* (1878) 95 U.S. 714 (*Pennoyer*) and *International Shoe*.[7]

---

[6] An example of a mixed question of law and fact appears at paragraph 19 of the petition, where BMS alleges that "Petitioner will suffer irreparable injury and be denied due process if it is forced to defend in California courts hundreds of claims brought by out-of-state plaintiffs who have no connection to this State and whose injuries did not occur here." RPI's informal verified response includes the statement that "BMS cannot demonstrate that it will suffer irreparable harm and be denied due process if its Petition were denied and it were 'forced' to defend the nonresident Plaintiffs' cases in California." We will treat BMS's entire allegation as being denied.

[7] Pursuant to section 410.10, California's "long-arm" statute (*Integral Development Corp. v. Weissenbach* (2002) 99 Cal.App.4th 576, 583), " '[a] court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States.' "

In *Pennoyer*, *supra*, 95 U.S. 714, the Supreme Court articulated a strictly territorial rule for what personal jurisdiction a state court could assert over a non-resident consistent with the Fourteenth Amendment. Neff, a California resident, owned a tract of land in Oregon. Mitchell, an Oregon resident, sued Neff in an Oregon state court for money owed for legal services rendered. After service of the suit by publication and mailing to Neff was made as required by Oregon law, judgment by default was entered against Neff. Pursuant to an execution issued upon this judgment, Pennoyer acquired the tract under a sheriff's deed. Neff then sued Pennoyer in federal court to recover the tract. (*Pennoyer*, *supra*, 95 U.S. at pp. 719-720.)

The *Pennoyer* court determined the judgment against Neff was void because a state could not, consistent with constitutional due process, acquire jurisdiction by the service methods used against a non-resident who is absent from the state. The court stated, "The authority of every tribunal is necessarily restricted by the territorial limits of the State in which it is established. Any attempt to exercise authority beyond those limits would be deemed in every other forum, as has been said by this court, an illegitimate assumption of power, and be resisted as mere abuse." (*Pennoyer*, *supra*, 95 U.S. at p. 720.) In other words, "no State can exercise direct jurisdiction and authority over persons or property without its territory." (*Id*. at p. 722.)

Sixty-seven years later, the Supreme Court replaced this strict territorial rule with a more flexible one in *International Shoe*. International Shoe Company was a Delaware corporation headquartered in Missouri (International Shoe). It challenged the right of the State of Washington to collect from it contributions to Washington's state unemployment compensation fund based on International Shoe's commissions to 11 to 13 salesmen living and working in Washington. International Shoe had no office in Washington (although its salesmen rented temporary and permanent sample rooms and were reimbursed by the company) and did not maintain any stock of merchandise there; its deliveries of merchandise sold by its salesmen were all made in interstate commerce. (*International Shoe*, *supra*, 326 U.S. at pp. 313-314.)

8

The Supreme Court reviewed the principles of personal jurisdiction at some length and rejected International Shoe's argument that personal jurisdiction over it in Washington would violate due process. Its opinion predated the court's later distinctions between "general jurisdiction" and "specific jurisdiction," [8] and it contains analysis that is relevant to both. In what has become the foundation of personal jurisdiction, the court stated, "While it has been held in cases on which appellant relies that continuous activity of some sorts within a state is not enough to support the demand that the corporation be amenable to suits unrelated to that activity, [citations], there have been instances in which the continuous corporate operations within a state were thought so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." (*International Shoe*, *supra*, 326 U.S. at p. 318.) The court continued, "although the commission of some single or occasional acts of the corporate agent in a state sufficient to impose an obligation or liability on the corporation has not been thought to confer upon the state authority to enforce it, [citation], other such acts, because of their nature and quality and the circumstances of their commission, may be deemed sufficient to render the corporation liable to suit." (*Ibid*.)

The court concluded, "It is evident that the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative. The test is not merely, as has sometimes been suggested, whether the activity, which the corporation has seen fit to procure through its agents in another state, is a little more or a little less. [Citations.] Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it

---

[8] That distinction was suggested by Professors von Mehren and Trautman in 1966. (See von Mehren & Trautman, *Jurisdiction to Adjudicate: A Suggested Analysis* (1966) 79 Harv. L.Rev. 1121, 1136.) The terminology, and the differentiation between "general or all purpose" jurisdiction and "specific or case linked" jurisdiction, were first discussed by the Supreme Court in *Helicopteros*, *supra*, 466 U.S. at pages 414, footnote 8 and 415, footnote 9.

9

was the purpose of the due process clause to insure." (*International Shoe, supra*, 326 U.S. at p. 319.)

As Justice Ginsburg recently noted in *Daimler*, *supra*, 134 S.Ct. at page 754, the *International Shoe* court ultimately found that Washington had personal jurisdiction over International Shoe based on what would later become known as "specific jurisdiction": "But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations; and, *so far as those obligations arise out of or are connected with the activities within the state*, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue." (*International Shoe, supra*, 326 U.S. at p. 319, italics added.)

The court found that International Shoe's activities were "systematic and continuous throughout the years in question. They resulted in a large volume of interstate business, in the course of which appellant received the benefits and protection of the laws of the state, including the right to resort to the courts for the enforcement of its rights. The obligation which is here sued upon arose out of those very activities. It is evident that these operations establish sufficient contacts or ties with the state of the forum to make it reasonable and just according to our traditional conception of fair play and substantial justice to permit the state to enforce the obligations which appellant has incurred there." (*International Shoe, supra*, 326 U.S. at p. 320.)

Since *International Shoe* and before *Daimler*, courts determining whether general jurisdiction existed often focused on the quality and quantity of contacts a company had with a particular state, without much additional analysis or inquiry. This appears to be the approach taken by the RPI and court below. However, as we now discuss, *Goodyear* and *Daimler* together make clear that general jurisdiction should be asserted only when the evidence indicates the company is " ' "essentially at home" ' " in the state. (*Daimler*, *supra*, 134 S.Ct. at p. 751.)

10

**B. *Goodyear***

The Supreme Court first referred to this "at home" standard in *Goodyear*. Two young soccer players from North Carolina were killed in a bus accident outside Paris, France. Their parents filed wrongful-death suits in the state courts of North Carolina against three foreign Goodyear entities, which were located in Luxembourg, Turkey, and France respectively (together petitioners). They all were indirect subsidiaries of Goodyear USA, an Ohio corporation also named as a defendant. The facts showed that the petitioners "[had] no place of business, employees, or bank accounts in North Carolina. They [did] not design, manufacture, or advertise their products in North Carolina. And they [did] not solicit business in North Carolina or themselves sell or ship tires to North Carolina customers. Even so, a small percentage of petitioners' tires (tens of thousands out of tens of millions manufactured between 2004 and 2007) were distributed within North Carolina by other Goodyear USA affiliates. These tires were typically customer ordered to equip specialized vehicles . . . and . . . the type of tire involved in the accident, a Goodyear Regional RHS tire manufactured by Goodyear Turkey, was never distributed in North Carolina." (*Goodyear*, *supra*, 131 S.Ct. at p. 2852.)

The petitioners (but not Goodyear USA) moved to dismiss the claims against them for lack of personal jurisdiction. The trial court denied their motion and the North Carolina Court of Appeals affirmed. The Supreme Court reversed in a unanimous decision written by Justice Ginsburg. It rejected the view of the North Carolina courts that North Carolina had general jurisdiction over the petitioners consistent with the Due Process Clause of the Fourteenth Amendment because some of their tires, although manufactured abroad, had reached North Carolina through the " 'the stream of commerce.' " "A connection so limited between the forum and the foreign corporation . . . is an inadequate basis for the exercise of general jurisdiction. Such a connection does not establish the 'continuous and systematic' affiliation necessary to empower North Carolina courts to entertain claims unrelated to the foreign corporation's contacts with the State." (*Goodyear*, *supra*, 131 S.Ct. at p. 2851.)

11

The *Goodyear* court could have ended its analysis there, but it did not. Quoting *International Shoe*, it described "general" jurisdiction as " 'instances in which continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities.' " (*Goodyear*, *supra*, 131 S.Ct. at p. 2853, quoting *International Shoe*, *supra*, 326 U.S. at p. 318.) It continued, "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." (*Goodyear* at pp. 2853-2854.) The court favorably cited a 23-year old Texas Law Review article by Professor Lea Brilmayer as "identifying domicile, place of incorporation, and principal place of business as 'paradig[m]' bases for the exercise of general jurisdiction." (*Goodyear* at p. 2854, citing Brilmayer, *A General Look At General Jurisdiction* (1988) 66 Texas L.Rev. 721, 728.)

BMS relies here, as it did in the trial court, upon the *Goodyear* court's use of the phrase "at home" as setting the minimum standard under which general jurisdiction can be asserted against an out of state corporate defendant. But that phrase was not explained in the court's *Goodyear* decision beyond the reference to Professor Brilmayer's law review article. To the contrary, the *Goodyear* court, after discussing the only two general jurisdiction cases decided by the court after *International Shoe, Perkins v. Benquet Consolidated Mining Co.* (1952) 342 U.S. 437 (*Perkins*) and *Helicopteros*, *supra*, 466 U.S. 408, concluded, "petitioners are in no sense at home in North Carolina.[9] Their

**9** Justice Ginsburg also used the phrase "at home" in her dissenting opinion in *J. McIntyre Machinery, Ltd. v. Nicastro* (2011) ___ U.S. ___ [131 S.Ct. 2780] (*J. McIntyre*), which was announced on the same day as *Goodyear*. *J. McIntyre* involved injury to a New Jersey resident in New Jersey from use of a machine made by a British company with no direct connections to that state, but which marketed machines extensively in the United States through a distributor. Justice Ginsburg parted ways from the four justices in the plurality opinion to express her view that marketing with the expectation of sales throughout the United States could be sufficient to support specific jurisdiction over an injury claim arising in New Jersey. She agreed, however, citing *Goodyear*, that the company was not subject to general jurisdiction in New Jersey courts

attenuated connections to the State . . . fall far short of . . . 'the continuous and systematic general business contacts' necessary to empower North Carolina to entertain suit against them on claims unrelated to anything that connects them to the State." (*Goodyear, supra,* 131 S.Ct. at p. 2857, quoting *Helicopteros*, *supra*, 466 U.S. at p. 416.)

Thus, while the court's decision in *Daimler* has proven BMS to be correct about the significance of these passing references to "at home" in *Goodyear*, a further contouring of the law of general jurisdiction was by no means obvious from the *Goodyear* decision. This was especially true in light of the *Goodyear* court's observation that "[t]he canonical opinion in this area remains" *International Shoe* (*Goodyear, supra*, 131 S.Ct. at p. 2853) and its own quoting of the traditional standard for general jurisdiction: " 'the continuous and systematic general business contacts necessary to empower [the forum state] to entertain suit against them on claims unrelated to anything that connects them to the State.' " (*Id*. at p. 2857, quoting *Helicopteros*, *supra*, 466 U.S. at p. 416.)[10]

## C. *Daimler*

The Supreme Court further explained its "at home" standard in *Daimler*. Argentinean residents with no connection to California sued Daimler AG, alleging that its wholly-owned Argentinean subsidiary collaborated with state security forces to kidnap, detain, torture, and kill plaintiffs or their relatives in Argentina during Argentina's " 'Dirty War' " between 1976 and 1983. They filed suit in the Northern District of California based upon a theory of general jurisdiction. Daimler AG had no contact with California, but another of its wholly owned subsidiaries, Mercedes-Benz USA, LLC

---

because it was "hardly 'at home' in New Jersey," but once more provided no further explanation for what it meant to be "at home" for jurisdictional purposes. (*Id*. at p. 2797 [dis. opn. of Ginsburg, J.].)

[10] Because of our conclusion that *Daimler* forecloses the RPI's general jurisdiction argument, we need not discuss the very different facts before the Supreme Court in *Perkins*, in which general jurisdiction was upheld, and *Helicopteros*, in which it was not. Neither case applied the doctrine of specific jurisdiction, which we take up, *post*.

13

(MBUSA), did extensive business in California, although it was incorporated in Delaware and had its principal place of business in New Jersey. The district court granted Daimler's motion to dismiss for lack of personal jurisdiction, but the Ninth Circuit reversed. (*Daimler*, *supra*, 134 S.Ct. at pp. 751-753.)

The Supreme Court granted certiorari and reversed. It noted that the plaintiffs' theory of general jurisdiction included that, "if a Daimler-manufactured vehicle overturned in Poland, injuring a Polish driver and passenger, the injured parties could maintain a design defect suit in California." (*Daimler*, *supra*, 134 S.Ct. at p. 751.) It held that "[e]xercises of personal jurisdiction so exorbitant . . . are barred by due process constraints on the assertion of adjudicatory authority." (*Ibid*.) It repeated its holding in *Goodyear* that a court may assert general jurisdiction "over a foreign corporation 'to hear any and all claims against [it]' only when the corporation's affiliations with the State in which suit is brought are so constant and pervasive *'as to render [it] essentially at home in the forum State*.' " (*Daimler* at p. 751, italics added.) "Instructed by *Goodyear*," the court concluded that "Daimler [was] not 'at home' in California, and cannot be sued there for injuries plaintiffs attribute to MB Argentina's conduct in Argentina." (*Ibid*.)

Importantly for our case, the *Daimler* court also held that Daimler's connections to California through MBUSA were insufficient to support general jurisdiction. MBUSA, an indirect subsidiary of Daimler, served as Daimler's exclusive importer and distributor in the United States, "purchasing Mercedes-Benz automobiles from Daimler in Germany, then importing those vehicles, and ultimately distributing them to independent dealerships located throughout the Nation. Although MBUSA's principal place of business is in New Jersey, MBUSA ha[d] multiple California-based facilities, including a regional office in Costa Mesa, a Vehicle Preparation Center in Carson, and a Classic Center in Irvine. . . . MBUSA [was] the largest supplier of luxury vehicles to the California market. In particular, over 10% of all sales of new vehicles in the United States [took] place in California, and MBUSA's California sales account[ed] for 2.4% of Daimler's worldwide sales." (*Daimler*, *supra*, 134 S.Ct. at p. 752.) Nonetheless, the court concluded, "[e]ven if we were to assume that MBUSA is at home in California, and

14

further to assume MBUSA's contacts are imputable to Daimler, there would still be no basis to subject Daimler to general jurisdiction in California, for Daimler's slim contacts with the State hardly render it at home there." (*Id.* at p. 760.)

The *Daimler* court further explained, "*Goodyear* made clear that only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there. 'For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home.' [Citations.] With respect to a corporation, the place of incorporation and principal place of business are 'paradig[m] . . . bases for general jurisdiction.' [Citation.] Those affiliations have the virtue of being unique—that is, each ordinarily indicates only one place—as well as easily ascertainable. [Citation.] These bases afford plaintiffs recourse to at least one clear and certain forum in which a corporate defendant may be sued on any and all claims." (*Daimler, supra,* 134 S.Ct. at p. 760.) The court "[did] not foreclose the possibility that . . . a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State[,]" but stated this was "an exceptional case." (*Id.* at p. 761, fn. 19.)

"*Goodyear* did not hold that a corporation may be subject to general jurisdiction *only* in a forum where it is incorporated or has its principal place of business; it simply typed those places paradigm all-purpose forums. Plaintiffs would have us look beyond the exemplar bases *Goodyear* identified, and approve the exercise of general jurisdiction in every State in which a corporation 'engages in a substantial, continuous, and systematic course of business.' [Citation.] That formulation, we hold, is unacceptably grasping.

". . . [T]he words 'continuous and systematic' were used in *International Shoe* to describe instances in which the exercise of *specific* jurisdiction would be appropriate. [Citation.] Turning to all-purpose jurisdiction, in contrast, *International Shoe* speaks of 'instances in which the continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit . . . *on causes of action arising from dealings*

15

*entirely distinct from those activities*.' [Citations.] Accordingly, the inquiry under *Goodyear* is not whether a foreign corporation's in-forum contacts can be said to be in some sense 'continuous and systematic,' it is whether that corporation's 'affiliations with the State are so "continuous and systematic" as to render [it] essentially at home in the forum State.' " (*Daimler*, *supra*, 134 S.Ct. at p. at pp.760-761.) The court further distinguished between general and specific jurisdiction by noting that they "have followed markedly different trajectories post-*International Shoe*. Specific jurisdiction has been cut loose from *Pennoyer*'s sway, but we have declined to stretch general jurisdiction beyond limits traditionally recognized. As this Court has increasingly trained on the 'relationship among the defendant, the forum, and the litigation,' [citation], *i.e.*, specific jurisdiction, general jurisdiction has come to occupy a less dominant place in the contemporary scheme." (*Daimler*, *supra*, 134 S.Ct. at pp. 757-758.)

The court further clarified that "general jurisdiction inquiry does not 'focu[s] solely on the magnitude of the defendant's in-state contacts.' [Citation.] General jurisdiction instead calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide. A corporation that operates in many places can scarcely be deemed at home in all of them. Otherwise, 'at home' would be synonymous with 'doing business' tests framed before specific jurisdiction evolved in the United States." (*Daimler*, *supra*, 134 S.Ct. at p. 762, fn. 20.)

**D. *Application of Goodyear and Daimler to This Case***

We recognize that the trial court's determination that it has general jurisdiction was based on a record created and an analysis engaged in prior to *Daimler*. As a result, the RPI, who have the burden of proving jurisdiction here (*Snowney v. Harrah's Entertainment, Inc.* (2005) 35 Cal.4th 1054, 1062 (*Snowney*); *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 449 (*Vons*)), may not have pursued certain discovery and did not present certain facts and arguments that are relevant post-*Daimler* to determining whether general jurisdiction exists.

Specifically, the RPI focused on BMS's significant contacts with California. They did not establish that BMS is incorporated, has its principal place of business, or has its

headquarters here.  Further, the RPI did not present much, if any, evidence regarding BMS's activities in their entirety and, therefore, did not establish that BMS's contacts with California were somehow so exceptional as to render BMS "essentially at home" here.  Based on the record before us, we cannot effectively distinguish BMS's extensive sales and research activities in California from the extensive sales activities of MBUSA in California as discussed in *Daimler*, which the Supreme Court ruled were insufficient to establish the State had general jurisdiction over Daimler.  Therefore, the trial court's ruling that it had general jurisdiction over BMS cannot be allowed to stand.

## II.  *Specific Jurisdiction*

As Division Four of this court has noted, "we do not review the reasons why the trial court ruled as it did, but consider the validity of its *ruling*.  If a trial court's ruling is correct, we will affirm, even if its reasoning was flawed." (*In re Automobile Antitrust Cases I and II* (2005) 135 Cal.App.4th 100, 117.)  Although the parties debated specific jurisdiction below, the trial court, without the benefit of *Daimler*, did not find it necessary to address that issue.  The parties again debate the issue in this appeal.  We decide the issue now because there is no dispute as to the jurisdictional facts.[11]  In such a circumstance, " ' "the question of jurisdiction is purely one of law and the reviewing court engages in an independent review of the record." ' " (*Snowney*, *supra*, 35 Cal.4th at p. 1062, quoting *Vons*, *supra*, 14 Cal.4th at p. 449.)  Upon conducting such an independent review, we conclude the trial court has specific jurisdiction over BMS.

---

[11]  At oral argument, the RPI's counsel suggested that if we were inclined to rule against the RPI on the issue of specific jurisdiction, we should remand so that a more complete record of McKesson's role with respect to the RPI could be developed.  BMS's counsel opposed that suggestion, stating that the RPI had a full and fair opportunity to take discovery in opposition to the motion to quash.  We note that the record provided to us does not show that the RPI sought to continue the hearing on the consolidated motion to quash because of any claim of inadequate opportunity for discovery.  Be that as it may, for the reasons discussed, *post*, we find the undisputed facts before us sufficient to support specific jurisdiction over BMS.

17

The Supreme Court's discussion in *Daimler* indicates that specific jurisdiction continues to "flourish" as it has for many years.[12]  Whether or not a court has specific jurisdiction over a defendant involves an analysis of whether, first, the defendant has " 'purposefully directed' " its activities at the forum state (*Keeton v. Hustler Magazine, Inc.* (1984) 465 U.S. 770, 774 (*Keeton*); second, the plaintiff's claims are related to or arise out of these forum-directed activities (*Helicopteros*, *supra*, 466 U.S. at p. 414); and, third, the exercise of jurisdiction is reasonable.  (*Asahi*, *supra*, 480 U.S. at p. 113.)  That said, as our own Supreme Court has noted, "the United States Supreme Court has rejected the use of 'talismanic jurisdictional formulas' (*Burger King*, *supra*, 471 U.S. at p. 485), stating that ' "the facts of each case must [always] be weighed" in determining whether personal jurisdiction would comport with "fair play and substantial justice." ' " (*Vons*, *supra*, 14 Cal.4th at p. 460.)  We now discuss each of these matters.

**A.  *The Traditional Conception of "Fair Play and Substantial Justice"***

In *Daimler*, the Supreme Court noted:  "*International Shoe*'s conception of 'fair play and substantial justice' presaged the development of two categories of personal jurisdiction.  The first category is represented by *International Shoe* itself, a case in which the in-state activities of the corporate defendant 'ha[d] not only been continuous and systematic, but also g[a]ve rise to the liabilities sued on.' . . . . Adjudicatory authority of this order, in which the suit 'aris[es] out of or relate[s] to the defendant's contacts with the forum,' [citation] is today called 'specific jurisdiction.' " (*Daimler*, *supra*, 134 S.Ct. at p. 754, citing *Goodyear*, *supra*, 131 S.Ct. 2853.)

---

[12]  Justice Ginsburg, responding on behalf of the *Daimler* majority to Justice Sotomayor's concern, stated in a concurring opinion, that narrowing the doctrine of general jurisdiction would result in injustices, wrote:  "Remarkably, Justice Sotomayor treats specific jurisdiction as though it were barely there.  Given the many decades in which specific jurisdiction has flourished, it would be hard to conjure up an example of the 'deep injustice' Justice Sotomayor predicts as a consequence of our holding that California is not an all-purpose forum for suits against *Daimler*." (*Daimler*, *supra*, 134 S.Ct. at p. 758, fn. 10.)

As suggested by Justice Sotomayor 's concurrence in *Daimler* and the majority's response, this concept, referred to by Justice Sotomayor as "reciprocal fairness," is a " 'touchstone principle of due process' " regarding specific jurisdiction. (*Daimler*, *supra*, 134 S.Ct. at p. 758, fn. 10; *Id*. at p. 768 [conc. opn. of Sotomayor, J.].) It dates back to *International Shoe*, in which the Supreme Court held, "to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations; and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue." (*International Shoe, supra,* 326 U.S. at p. 319.) In other words, in analyzing the exercise of specific jurisdiction, "[o]nce it has been decided that a defendant purposely established minimum contacts with the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.' " (*Burger King*, *supra*, 471 U.S. at p. 476.)

## B. *"Minimum Contacts" and "Relatedness"*

Several more recent Supreme Court cases have reaffirmed this fundamental tenet of personal jurisdiction in discussing the minimum contacts between a defendant and a forum state, and the relatedness of these contacts to a plaintiff's claims, that are necessary to establish specific jurisdiction. For example, in *World-Wide Volkswagen Corp. v. Woodson* (1980) 444 U.S. 286 (*World-Wide Volkswagen*), defendant, a New York automobile wholesaler and retailer with no contact with Oklahoma, was sued in Oklahoma by New York residents who were passing through that state when they had a car accident. The Supreme Court held that the accident's location was not a sufficient basis for an Oklahoma court's assertion of personal jurisdiction over the defendant. In so holding, the court reiterated the rule of *International Shoe*: "As has long been settled, and as we reaffirm today, a state court may exercise personal jurisdiction over a nonresident defendant only so long as there exist 'minimum contacts' between the defendant and the forum State. [*International Shoe*, s*upra*, at p. 316]. The concept of

minimum contacts, in turn, can be seen to perform two related, but distinguishable, functions. It protects the defendant against the burdens of litigating in a distant or inconvenient forum. And it acts to ensure that the States through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system. [¶] The protection against inconvenient litigation is typically described in terms of 'reasonableness' or 'fairness.' We have said that the defendant's contacts with the forum State must be such that maintenance of the suit 'does not offend "traditional notions of fair play and substantial justice." ' [*International Shoe, supra*, at p. 316.]" (*World-Wide Volkswagen*, *supra*, 444 U.S. at pp. 291-292.)

That said, the *World-Wide Volkswagen* court also noted that "[t]he limits imposed on state jurisdiction by the Due Process Clause, in its role as a guarantor against inconvenient litigation, have been substantially relaxed over the years" because of "a fundamental transformation in the American economy." (*World-Wide Volkswagen*, *supra*, 444 U.S. at pp. 292-293.) It quoted its view some years before in *McGee v. International Life Ins. Co.* (1957) 355 U.S. 220 (*McGee*) that there was an increasing nationalization of commerce and amount of business conducted by mail across state lines, and that " 'at the same time modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity.' " (*World-Wide Volkswagen*, at p. 293, quoting *McGee*, at pp. 222-223.) These historical developments, the court further noted, "have only accelerated in the generation since" *McGee* was decided. (*World-Wide Volkswagen*, at p. 293.)

In a case decided a few years after *World-Wide Volkswagen*, *Keeton*, *supra*, 465 U.S. 770, the Supreme Court, again guided by the traditional conception of fair play and substantial justice, found specific jurisdiction existed, even though neither the plaintiff nor the defendant resided in the forum State and most of the plaintiff's injuries occurred elsewhere. In *Keeton*, the United States Court of Appeals for the First Circuit had upheld a district court's dismissal of plaintiff's libel suit against Hustler Magazine for lack of personal jurisdiction because New Hampshire's "interest in redressing the tort of libel to petitioner [was] too attenuated for an assertion of personal jurisdiction over respondent."

20

(*Keeton*, *supra*, 465 U.S. at p. 773.)  The First Circuit also had held that it would have been unfair to apply New Hampshire's uniquely long six-year statute of limitations for libel damages accruing throughout the United States under the " 'single publication rule.' "  (*Ibid*.)

The Supreme Court reversed.  It held that Hustler Magazine, having "continuously and deliberately exploited the New Hampshire market, . . . must reasonably anticipate being haled into court there in a libel action based on the contents of its magazine," even if New Hampshire applied the single publication rule to allow recovery of damages from publications throughout the United States that otherwise would have been time-barred.  (*Keeton*, *supra*, 465 U.S. at pp. 781, 774-775.)  The court repeated its previous instruction that, "[i]n judging minimum contacts, a court properly focuses on 'the relationship among the defendant, the forum, and the litigation.'  [Citations.]  Thus, it is certainly relevant to the jurisdictional inquiry that petitioner is *seeking* to recover damages suffered in all States in this one suit.  The contacts between respondent and the forum must be judged in the light of that claim, rather than a claim only for damages sustained in New Hampshire.  That is, the contacts between respondent and New Hampshire must be such that it is 'fair' to compel respondent to defend a multistate lawsuit in New Hampshire seeking nationwide damages for all copies of the five issues in question, even though only a small portion of those copies were distributed in New Hampshire."  (*Id*., at p. 775.)

*Keeton* further instructs that the doctrine of specific jurisdiction can apply to the claims of a non-resident against a non-resident.  Initially, we acknowledge, as does *Keeton*, that the clearest case for specific jurisdiction exists when the non-resident defendant's conduct has caused injury to plaintiff in his or her state of residence, and plaintiff sues there.  That has been understood since *International Shoe*, *supra*, 326 U.S. at page 317 (" '[p]resence' in the state . . . has never been doubted when the activities of the corporation there have not only been continuous and systematic, but also give rise to the liabilities sued on, even though no consent to be sued or authorization to an agent to accept service of process has been given").  However, even though most cases in which

21

specific jurisdiction has been upheld involved a resident plaintiff, the Supreme Court has *not* held that due process *requires* that to be so.

To the contrary, in addition to reiterating the longstanding rule that "in judging minimum contacts, a court properly focuses on 'the relationship among the defendant, the forum, and the litigation' " (*Keeton, supra*, 465 U.S. at p. 775), *Keeton* makes clear that "[p]laintiff's residence may be the focus of the activities of the defendant out of which the suit arises. [Citations.] But plaintiff's residence in the forum State is not a separate requirement, and lack of residence will not defeat jurisdiction established on the basis of defendant's contacts." (*Id*. at p. 780; accord, *Walden v. Fiore* (2014) ___ U.S. ___ [134 S.Ct. 1115, 1122-1123] (*Walden*)). As the Supreme Court stated in its latest reiteration of the minimum contacts necessary to establish specific jurisdiction, "[d]ue process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." (*Walden* at pp. 1122-1123, quoting *Burger King, supra*, 471 U.S. at p. 475.)

Although the doctrine of specific jurisdiction continues to flourish, its application has proved to be problematic for the Supreme Court. For example, on the same day that it decided *Goodyear*, the court issued *J. McIntyre*, *supra*, 131 S.Ct. 2780. As we have discussed, the court held that New Jersey did not have specific jurisdiction over the British manufacturer of a machine that caused an injury to plaintiff in New Jersey. The manufacturer marketed machines in the United States, but not New Jersey, through a domestic distributor. Justice Kennedy wrote for the plurality, consisting also of Chief Justice Roberts and Justices Scalia and Thomas, with whom Justices Breyer and Alito concurred and Justices Ginsburg, Sotomayor, and Kagan dissented. Justice Kennedy, acknowledging that the doctrine of specific jurisdiction remains fully viable, wrote that "submission through contact with and activity directed at a sovereign may justify specific jurisdiction 'in a suit arising out of or related to the defendant's contacts with the forum.' " (*Id*. at pp. 2787-2788.) However, he also acknowledged that "[t]he rules and standards for determining when a State does or does not have jurisdiction over an absent

party have been unclear because of decades-old questions left open in [*Asahi*, *supra*, 480 U.S. 102]." (*Id.* at p. 2785.)[13]

Furthermore, the Supreme Court has not yet further defined the second step of specific jurisdiction analysis, that being what it means for a suit to "arise out of" or "relate" to a defendant's contacts with the State. (See *Helicopteros*, *supra*, 466 U.S. at p. 416, fn. 10.) However, California's Supreme Court has provided further guidance on the "relatedness" part of the specific jurisdiction analysis. We turn now to the key cases in which it has done so.

In *Vons*, *supra*, 14 Cal.4th 434, our Supreme Court upheld California's specific jurisdiction over two Jack-in-the-Box franchisees located in the State of Washington. Extensive litigation was pending in the San Diego County Superior Court arising from E. coli exposures to Jack-in-the-Box customers around the country. Vons supplied hamburger from a California plant to Foodmaker, Inc., a Delaware corporation with its principal place of business in San Diego, of which Jack-in-the-Box was a division. Foodmaker supplied many items, including hamburger, to its Jack-in-the Box franchisees throughout the United States. Eighty-five franchisees from California and other states, whose customers had not been injured, sued Vons and Foodmaker in San Diego for loss of business caused by news of the E. coli outbreak. (*Vons*, *supra*, 14 Cal.4th at pp. 440-441.)

When Foodmaker cross-claimed against Vons in San Diego, Vons filed a cross complaint against, among others, two Washington corporations who were Jack-in-the-Box franchisees, Seabest Foods, Inc. and Washington Restaurant Management, Inc. The

---

[13] Justices Breyer and Alito concurred in the judgment only because the case did not involve recent changes in commerce and communication and they saw no need to decide the question as the plurality had. The dissenting justices indicated that, given the defendant's extensive contacts with other parts of the United States, they would have upheld the application of specific jurisdiction by the New Jersey Supreme Court on the basis that it was "fair and reasonable, given the mode of trading of which this case is an example, to require the international seller to defend at the place its products cause injury." (*J. McIntyre*, *supra*, 131 S.Ct. at p. 2800 [dis. opn. of Ginsburg, J.].)

two owned restaurants at which customers were allegedly served contaminated burgers that caused injuries to customers. Vons alleged that the outbreak would not have occurred but for their negligence in handling the meat. It alleged causes of action for negligence, negligent and intentional interference with economic advantage, and indemnity against them. (*Vons*, *supra*, 14 Cal.4th at pp. 441-442.)

The appeal focused on the motions by the two Washington franchisees to quash service of the summons regarding Vons's cross complaint for lack of personal jurisdiction, which were granted and affirmed on appeal. Our Supreme Court reversed, in significant part because both franchisees had consented to jurisdiction over them in disputes with Foodmaker (but not Vons) in California. In addition, both had other contacts in California. In doing so, the court extensively reviewed pertinent California and federal cases and summarized the test for specific jurisdiction as follows: " 'The crucial inquiry concerns the character of defendant's activity in the forum, whether the cause of action *arises out of or has a substantial connection with that activity*, and the balancing of the convenience of the parties and the interests of the state in assuming jurisdiction.' " (*Vons*, *supra*, 14 Cal.4th at pp. 452-453, quoting *Cornelison v. Chaney* (1976) 16 Cal.3d 143, 148 (*Cornelison*).)

The court adopted this "substantial connection" test after a careful analysis, including of *International Shoe*. (E.g., *Vons*, *supra*, 14 Cal.4th at p. 474 [quoting *International Shoe*'s statement that an undue burden would not be imposed if a defendant were required to respond to suits regarding obligations that "arise out of *or are connected with* the activities within the state" (*International Shoe*, *supra*, 326 U.S. at p. 319, italics added]). It noted that the United States Supreme Court had not articulated a precise test for evaluating the "relatedness" requirement.

After analyzing the language in which the high court described the doctrine, the *Vons* court considered and rejected several tests proffered by the parties. (*Vons*, *supra*, 14 Cal.4th at pp. 453-455.) It held that the so-called proximate cause test, is too narrow, the " 'but for' " test is too broad and amorphous, and the "substantive relevance test" has an "overly restrictive view of the interest of the state in providing a judicial forum and

24

redress to its residents." (*Id*. at p. 475.)[14] Instead, the *Vons* court adopted the "substantial connection" test, under which the relatedness requirement is satisfied if "there is a substantial nexus or connection between the defendant's forum activities and the plaintiff's claim." (*Id*. at p. 456.)[15]

Three aspects of *Vons* are of particular note to the present case. First, the *Vons* court concluded that a defendant's contacts with the state and their connection to the claim at-issue were "inversely related." It stated, "as the high court suggested in *International Shoe*, *supra*, 326 U.S. 310, for the purpose of establishing jurisdiction the intensity of forum contacts and the connection of the claim to those contacts are *inversely related*. (See *International Shoe*, *supra*, 326 U.S. at p. 317 [' "Presence" in the state . . . has never been doubted when the activities of the corporation there have not only been continuous and systematic, but also give rise to the liabilities sued on . . . . Conversely it has been generally recognized that the casual presence of the corporate agent or even his conduct of single or isolated items of activities . . . are not enough to subject it to suit on causes of action unconnected with the activities there.'].)" (*Vons*, *supra*, 14 Cal.4th at p. 452.) Quoting *Cornelison*, the *Vons* court stated, " '[A]s the relationship of the defendant with the state seeking to exercise jurisdiction over him grows more tenuous, the scope of jurisdiction also retracts, and fairness is assured by limiting the circumstances under which the plaintiff can compel him to appear and defend.' " (*Vons*, *supra*, 14 Cal.4th at p. 448, quoting *Cornelison*, *supra*, 16 Cal.3d at pp. 147-148, fn. omitted.)

Second, the *Vons* court criticized the appellate court for treating the lack of relationships between Vons and the franchisees as "critical in determining whether the claim was sufficiently related to the forum contacts to permit the exercise of specific

---

[14] We will return to the state's interest in providing a forum in our discussion of the "reasonableness" factors, *post.*

[15] Among the precedents the *Vons* court relied upon for the "substantial connection" test of relatedness was its earlier decision in *Cornelison, supra* 16 Cal.3d at page 148, *McGee*, *supra*, 355 U.S. at page 223, and *Hanson v. Denckla* (1958) 357 U.S. 235, 250-253, all of which discuss the significance of such a connection. (*Vons*, *supra*, 14 Cal.4th at pp. 448, 452.)

25

jurisdiction in California. Contrary to the Court of Appeal's thesis, . . . the defendant's forum activities need not be directed at the *plaintiff* in order to give rise to specific jurisdiction." (*Vons*, *supra*, 14 Cal.4th at p. 457, citing *Keeton, supra*, 465 U.S. 770, 775*; Cornelison supra*, 16 Cal.3d 143 ["jurisdiction found although the defendant's business activities in California were not directed at the accident victim"]; *Akro Corp. v. Luker* (Fed. Cir. 1995) 45 F.3d 1541. 1547 [" 'plaintiff need not be the forum resident toward whom any, much less all, of the defendant's relevant activities were purposefully directed' "]; *In re Oil Spill by Amoco Cadiz off the Coast of France on March 16, 1978* (1983) 699 F.2d 909, 917 ["French victims of oil spill may bring a tort action against a Spanish shipbuilder in an Illinois court; their claim 'could readily be said to arise from the negotiating and signing, in Illinois, of the [shipbuilding] contract' even though the negotiations obviously were not directed at the plaintiffs."].) "The United States Supreme Court has stated more than once that *the nexus required to establish specific jurisdiction is between the defendant, the forum, and the litigation* (*Helicopteros, supra*, 466 U.S. at p. 411; [citation]). . . . For the purpose of deciding whether a defendant has minimum contacts or purposefully has availed itself of forum benefits, the relevant contacts are said to be with the *forum*, because it is the defendant's choice to take advantage of opportunities that exist in the forum that subjects it to jurisdiction. ([*Asahi, supra*, 480 U.S. at p. 112; *Burger King*, *supra*, 471 U.S. at pp. 475, 479; *Helicopteros*, *supra*, 466 U.S. at p. 414; *Shaffer v. Heitner* (1977) 433 U.S. 186, 204.])" (*Vons*, *supra*, 14 Cal.4th at p. 458, italics added.)

Third, the *Vons* court emphasized that the ultimate goal of the due process clause is fairness. Therefore, a court determining specific jurisdiction should focus on the relationship between a nonresident's contacts with the State and the claim involved to ensure a nonresident defendant is not unfairly brought into court on the basis of random contacts. This does *not* require that the claim arise directly out of a defendant's contacts with California. To the contrary, the court determined, "When, as here, the defendants sought out and maintained a continuing commercial connection with a California business [Foodmaker]*, it is not necessary that the claim arise directly from the*

26

*defendant's contacts in the state.*" (*Vons*, *supra*, 14 Cal.4th at p. 453, italics added.) "Rather, as long as the claim bears a substantial connection to the nonresident's forum contacts, the exercise of specific jurisdiction is appropriate. The due process clause is concerned with protecting nonresident defendants from being brought unfairly into court in the forum, on the basis of random contacts. That constitutional provision, however, does not provide defendants with a shield against jurisdiction when the defendant purposefully has availed himself or herself of benefits in the forum. The goal of fairness is well served by the standard . . . that . . . there must be a *substantial connection* between the forum contacts and the plaintiff's claim to warrant the exercise of specific jurisdiction." (*Id*. at p. 452.)

Although *Vons* arose in the context of a franchise relationship not unlike that in *Burger King*, our Supreme Court has not restricted its view of the relatedness requirement to that type of business or to non-resident franchisees that have agreed to litigate disputes with their franchisor in California. To the contrary, we have found in our own independent research that in *Snowney*, *supra*, 35 Cal.4th 1054, the court confirmed and extended its view of what is needed to satisfy the relatedness requirement. There, a group of Nevada hotels were sued by a class of hotel patrons who alleged that they had not been provided with notice of an energy surcharge imposed on all hotel guests. Although the hotel defendants conducted no business and had no bank accounts or employees in California, they advertised heavily in California and obtained a significant percentage of their business from California residents. They also maintained an Internet web site and a toll-free phone number for customers to obtain room quotes and make reservations.

The trial court granted the hotels' motion to quash, but the Second District Court of Appeal reversed. Our Supreme Court took the case and published a superseding opinion agreeing with the appellate court that specific jurisdiction was appropriate over defendants.

As in *Vons,* the *Snowney* court reviewed the requirement of the Fourteenth Amendment that plaintiffs establish defendant's minimum contacts with California. It

27

reiterated, as the Supreme Court had stated in *International Shoe* and other cases, that "[t]he test 'is not susceptible of mechanical application; rather, the facts of each case must be weighed to determine whether the requisite "affiliating circumstances" are present.' " (*Snowney*, *supra*, 35 Cal.4th at p. 1061.) After determining that defendants' extensive advertising and internet solicitations within California met the minimum contacts requirement, the court turned to the relatedness requirement, and found that the controversy was related to or arose out of defendants' contacts with California. (*Id.,* at p. 1067.) In again applying its "substantial connection" test, the court reiterated its analysis in *Vons* that " 'for the purpose of establishing jurisdiction the intensity of forum contacts and the connection of the claim to those contacts are inversely related.' [Citation.] '[T]he more wide ranging the defendant's forum contacts, the more readily is shown a connection between the forum contacts and the claim.' [Citation.] Thus, '[a] claim need not arise directly from the defendant's forum contacts in order to be sufficiently related to the contact to warrant the exercise of specific jurisdiction.' [Citation.] Moreover, the 'forum contacts need not be directed at the plaintiff in order to warrant the exercise of specific jurisdiction.' [Citing *Von's, supra.*] Indeed, ' " '[o]nly when the operative facts of the controversy are not related to the defendant's contact with the state can it be said that the cause of action does not arise from that [contact].' " ' " (*Snowney* at p. 1068, quoting *Vons, supra*, 14 Cal.4th at pp. 452, 455.)[16]

Indeed, our Supreme Court has determined this "substantial connection" need not have *any* relevance to establishing the plaintiff's claim. As we discussed, *Cornelison*, *supra*, 16 Cal.3d 143 was relied on by the *Vons* court in its articulation of this "substantial connection" standard. (*Vons, supra*, 14 Cal.4th at pp. 445-446, 448.) In *Cornelison*, the defendant, a Nebraska resident and a commercial trucker, was sued by a plaintiff, a resident of California, in a California court for his negligence in causing an

---

[16] The court rejected the invitation of amicus curiae Chamber of Commerce of the United States to reconsider *Vons* and adopt the substantive relevance test of relatedness. (*Snowney*, *supra*, 35 Cal.4th at p. 1068.)

accident in Nevada that killed plaintiff's husband. The defendant was on his way to California when he was involved in the accident.

Our Supreme Court determined that "California, consistent with the due process clause of the United States Constitution, may assert jurisdiction over a nonresident individual whose essentially interstate business has a relationship to this state, but whose allegedly tortious acts occurred outside the state." (*Cornelison*, *supra*, 16 Cal.3d at p. 146.) Regarding whether there was a substantial connection between the defendant's contacts with California and the plaintiff's claim, the court relied in part on the fact that the defendant had significant contacts with California, coming into the state twice a month for seven years as a trucker under a California license, and that the accident occurred not far from the California border, while defendant was bound for the state. (*Id*. at p. 149.) However, what appears to have tipped the balance for the court was the "interstate character of defendant's business." (*Id*. at p. 151.) The court stated, "Defendant's operation, by its very nature, involves a high degree of interstate mobility and requires extensive multi-state activity. A necessary incident of that business was the foreseeable circumstance of causing injury to persons in distant forums. While the existence of an interstate business is not an independent basis of jurisdiction which, without more, allows a state to assert its jurisdiction, this element is relevant to considerations of fairness and reasonableness. The very nature of defendant's business balances in favor of requiring him to defend here." (*Ibid*.)[17]

## C. *The "Minimum Contacts" and "Relatedness" Requirements are Met Here*

Although BMS's contacts with California that were described by the trial court no longer suffice under *Goodyear* and *Daimler* for assertion of general jurisdiction, they remain pertinent and persuasive for the first step of a specific jurisdiction analysis.

---

[17] Although not related to the substantial connection question, the court also referred to the fact that the plaintiff, also a witness to the accident, was a California resident, and that California had an interest in providing her with a forum for her claim. (*Cornelison*, *supra*, 16 Cal.3d at p. 151.) However, it also noted that some of the witnesses resided in Nevada. (*Ibid*.)

BMS's extensive, longstanding business activities in California, including in particular its sale of 196 million Plavix pills between 1998 and 2006 and nearly $1 billion worth of Plavix in California between 2006 and 2012, five offices and facilities, hundreds of California-based employees and sales representatives, and long-time maintaining of an in-State agent for service of process bear no resemblance to the "random, fortuitous, and attenuated" interests held to be insufficient in *World-Wide Volkswagen* and *Walden*. They provide evidence of far more than the minimum contacts necessary under *International Shoe* to support the exercise of specific jurisdiction. Indeed, comparing the economic benefits BMS has derived from its California sales of Plavix and the extent and duration of its California contacts with those of the Washington franchisees in *Vons* and the Nevada hotels in *Snowney*, it is clear that BMS has far more contacts with California, including an extensive physical presence here. At oral argument, counsel for BMS conceded that BMS's contacts with California satisfy the minimum contacts requirement for specific jurisdiction.[18]

The RPI have also satisfied the "relatedness" test because of the "substantial connection" between BMS's substantial, purposeful activities in California and the RPI claims. It is undisputed on the record before us that, as stated by a BMS representative below via declaration, "BMS' work on the development, manufacture, labeling, and marketing of, and securing regulatory approvals for Plavix was performed or directed from BMS's New York headquarters and/or its New Jersey operating facilities. [¶] . . . None of the work to develop Plavix took place in California. Nor has BMS ever manufactured Plavix in California."

Nonetheless, it is also undisputed that BMS has had substantial, continuous contact with California for many years, including regarding the sale of Plavix. The

---

[18] The nature and extent of BMS's contractual relationship with McKesson, and McKesson's relationship with the RPI, is not clear from the record. However, the fact that McKesson is headquartered in San Francisco is not disputed. Further, it is clear from the record that BMS has engaged McKesson as one of many distributors of Plavix over many years.

evidence indicates that BMS has "deliberately exploited" the relevant market in the State (*Keeton*, *supra*, 465 U.S. at p. 781) for many years, having sold over 196 million Plavix pills in California between 1998 and 2006 and nearly $1 billion worth of Plavix between 2006 and 2012.

Further, plaintiffs allege BMS's Plavix sales in California have led to injuries to California residents that are the same as those suffered by the RPI. At least 84, and perhaps as many as 251, California residents have sued BMS and McKesson in San Francisco because of perceived deficiencies in those pills which have caused such injuries in this state. If BMS is liable to any of the California plaintiffs because of proof which will be common for all plaintiffs, then those elements of each of the RPI's claims may also be established.

Moreover, the interstate character of BMS's business, and in particular its sales of Plavix, is also significant. In magnitudes far greater than was true regarding the relatively modest enterprise of the defendant trucker in *Cornelison*, a "necessary incident" of BMS's business is "the foreseeable circumstance of causing injury to persons in distant forums." (*Cornelison*, *supra*, 16 Cal.3d at p. 151.) While "not an independent basis of jurisdiction," it is relevant to a specific jurisdiction analysis. (*Ibid*.)[19]

Also, although the RPI injuries did not occur in the course of BMS's direct delivery of Plavix to the California market, plaintiffs allege, and the record suggests, that BMS sold product to both resident plaintiffs and the RPI as part of the distribution of Plavix in many states. In other words, the injuries are alleged to have occurred in the course of a common effort, another fact that weighs in favor of finding a "substantial connection" between BMS's contacts with California and the RPI's claims.

---

[19] As we have noted in footnote 9, *ante*, the *J. McIntyre* plurality disagreed with Justice Ginsburg's dissenting view that the marketing of a product with the expectation of nationwide sales was sufficient to support specific jurisdiction in that case. We do not mean to say it is sufficient by itself. However, nothing in *J. McIntyre* indicates it cannot be one of a number of factors considered in analyzing whether or not specific jurisdiction exists.

No California or federal case has been cited to us, and we have found none, in which this type of relationship between a non-resident corporate defendant, its very extensive California contacts, and the plaintiffs' claims has been examined. BMS does not discuss *Vons*, in its briefing, although the RPI do, and neither side discusses *Snowney*. Instead, BMS briefly discusses three earlier cases, an appellate court decision, *Spirits, Inc. v. Superior Court*, *supra*, 104 Cal.App.3d 918, 926, and two federal court decisions, *Glater v. Eli Lilly & Co.* (1st Cir. 1984) 744 F.2d 213, 216 and *Jones v. N. Am. Aerodynamics, Inc.* (D.Me. 1984) 594 F.Supp. 657, 660-662. At oral argument, counsel for BMS highlighted *Boaz v. Boyle & Co.* (1995) 40 Cal.App.4th 700, also briefly discussed in BMS's response to the amici for the RPI. *Boaz* is inapposite in light of the fact that it was conceded that the alleged injuries of the only California resident plaintiff had nothing to do with the California-related activities of the defendant who challenged jurisdiction, *none* of the plaintiffs' claims had *anything* to do with that defendant's contacts with California, and because of the modest nature of defendant's contacts, which were limited to "targeted mailers to physicians and advertising, principally if not entirely in national medical or medically related publications." (*Id*. at p. 717.) We do not find any of these cases persuasive regarding the present circumstances and need not discuss them further in light of our Supreme Court's later analyses and holdings in *Vons* and *Snowney*.

The reasoning of the United States and California Supreme Court cases we have discussed herein persuades us that BMS's activities are substantially connected to the RPI claims. In particular, the Supreme Court's analysis in *Keeton*, in which non-resident Hustler Magazine was required to appear in a New Hampshire court and answer charges that it had libeled non-resident plaintiff in numerous states via its sales of its magazine, even though only a small minority were sold in New Hampshire, indicates that a state court can assert jurisdiction against a nonresident accused by a nonresident of causing injuries, most of which occurred outside of the forum state. That both resident and non-resident plaintiffs are involved in the present suits (as opposed to the single plaintiff in *Keeton*) does not affect our conclusion.

32

Further, *Vons* teaches us that a defendant's contacts with California and their relatedness to the claims at hand are inversely related. (*Vons*, *supra*, 14 Cal.4th at p. 453.) In other words, " '[t]he more wide ranging the defendant's forum contacts, the more readily is shown a connection between the forum contacts and the claim.' " (*Snowney, supra,* 35 Cal.4th at p. 1068, quoting *Vons, supra*, 14 Cal.4th at p. 455.) Thus, given BMS's substantial, continual contacts with California, including its extensive sales of Plavix here, the presence of dozens (not one or two) of resident plaintiffs who allege precisely the same wrongdoing by BMS and McKesson (also a California resident) as is alleged by the RPI, as well as the interstate nature of BMS's business and its nationwide sales of Plavix are even more significant in determining whether the RPI's claims are sufficiently connected to BMS's California activity so that assertion of specific jurisdiction satisfies the traditional conception of fair play and substantial justice.

At oral argument, counsel for BMS suggested that finding specific jurisdiction appropriate in this case based on the similarity between the resident plaintiff's and the RPI's claims would permit "joinder to trump due process." This is not so. The identical nature of these claims is only one of a number of factors we have considered here. Further, it would be inappropriate to ignore so prominent an aspect of the matter before us as BMS asks us to do. As we have discussed, our own Supreme Court has noted that "the United States Supreme Court has rejected the use of 'talismanic jurisdictional formulas' (*Burger King*, *supra*, 471 U.S. at p. 485)" and instructed that " ' "the facts of each case must [always] be weighed" in determining whether personal jurisdiction would comport with "fair play and substantial justice." ' " (*Vons*, *supra*, 14 Cal.4th at p. 460.) Therefore, we decline to ignore the existence of the resident plaintiffs' claims in our relatedness analysis.

In short, we hold that the RPI have sustained their burden of showing sufficient contacts with California and the relatedness of these contacts to the claims at issue so as to satisfy the traditional test for specific jurisdiction under the United States and California Supreme Court cases discussed at length in this opinion.

**D.** *BMS Has Not Met Its Burden of Showing "Unreasonableness"*

Having determined that the RPI have met their initial burden of demonstrating facts justifying the exercise of specific jurisdiction (*Snowney*, *supra*, 35 Cal.4th at p. 1062), we now turn to BMS's burden, which is to demonstrate " ' "that the exercise of jurisdiction would be unreasonable." ' " (*Ibid.;* see also *Burger King, supra,* 471 U.S. at p. 477 ["where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable"].)

In determining whether BMS has met its burden, we review the factors identified by the United States Supreme Court and our Supreme Court that are to be considered in determining whether requiring BMS to defend here comports with the traditional conception of fair play and substantial justice. An appellate court " ' "must consider the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief. It must also weigh in its determination 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies.' " ' " (*Snowney*, *supra*, 35 Cal.4th at p. 1070, quoting *Vons*, *supra*, 14 Cal.4th at p. 476 and *Asahi*, *supra*, 480 U.S. at p. 113.)

Although BMS did not concede that it cannot satisfy this burden, neither has it made any effort to show why it should not be required to defend here, other than to argue that the RPI's claims are not sufficiently related to BMS's contacts with California. Nonetheless, we examine each of the factors and conclude BMS has not met its burden.

**1.** *BMS Has Not Shown Undue Burden In Defending Here*

BMS has provided no evidence that it would be unduly burdened if required to defend the RPI claims here. Nor could it. BMS may incur a substantial burden in defending the claims of the dozens, if not hundreds of California residents here. But whatever that burden proves to be, it will be incurred whether or not the RPI are allowed to bring their claims here as well.

While some additional burden may be attributed to defending the RPI's claims in addition to those of the California residents, BMS has made no effort to show what that burden would be, much less that it would be undue.

Further, whatever the incremental burden may be of combining the RPI's claims with those of the resident California plaintiffs, logic dictates that in order to determine whether it would be undue, BMS must show that it would be substantially greater than BMS would incur in defending each of the RPI's claims in his or her state of residence. Certainly if the RPI were forced to give up the benefits of combining their cases here, they would have the option of suing BMS in each of those states and not just in New York or Delaware.[20] Yet BMS has made no effort to address any difference in burden to it over defending in San Francisco versus the many other possible locations where the RPI could sue it.

To be sure, substantial pretrial preparation and discovery will be required in all of these cases. But the depositions of plaintiffs' prescribing and treating physicians, and of plaintiffs, will likely be taken in their states of residence regardless of where the RPI's claims are pursued. The discovery of BMS's key witnesses and documents will likely take place in New York and New Jersey, where those witnesses and key documents are likely located, regardless of where the RPI's claims are filed. BMS has not shown that any of these expenses will be greater if the cases proceed here.

---

[20] The RPI suggest that BMS seeks dismissal of their claims in order to force the RPI to refile in other states, allowing BMS to try again to remove the cases to federal courts and then have them transferred to the MDL court in the District of New Jersey, where its defenses might be more favorably received than in state courts. At oral argument, counsel for BMS did not dispute BMS's practice of removing cases against it to federal court and seeking to have them combined in the MDL proceeding in New Jersey. He candidly acknowledged that if each of the RPI is required to refile in his or her home state, New York, or New Jersey, fewer cases will be filed against BMS. BMS's due process rights do not include discouraging plaintiffs who may or may not have meritorious claims from pursuing them in an appropriate forum. Nor does due process entitle BMS to avoid the differences in procedures that exist between state and federal courts, such as regarding the standards for summary judgment, the admissibility of expert testimony, and the unanimity of jury verdicts.

Nor has BMS shown that the burden of having its counsel appear in San Francisco for case management conferences and hearings on motions will be any greater than would be the burden of appearing throughout the country. While it may be less costly for counsel to travel to some parts of the country than to fly to San Francisco, because of the California residents' claims counsel will be coming here anyway and can coordinate any RPI-specific motion with other California activity.

Should plaintiffs' claims survive BMS's likely motions for summary judgment and should it prove necessary for one or more of these cases to be tried in order for the parties to agree upon a range of values upon which the rest likely will be settled,[21] once again, BMS has provided no evidence that trial in San Francisco would be more costly for it than trial in, for example, Portland, Chicago, Cleveland, or Dallas.

BMS has summarily argued that it would be prejudiced by not being able to bring witnesses to San Francisco for trial, such as plaintiffs' treating physicians and other experts. That argument ignores the teachings of *McGee* and *Burger King* that the inquiry into fairness must take into account modern developments in commerce, transportation, and indeed, the manner in which litigation is conducted. Excellent quality video depositions of trial witnesses, including parties and experts, are now the norm, not the exception, in high stakes litigation such as this. Indeed, our Discovery Act has specific provisions for the taking of depositions outside California and for their use at trial.

In short, BMS has not demonstrated meaningful, much less undue, burden.

## 2. *California Has an Interest in Providing a Forum for the RPI's Claims*

As we discussed above, the paradigm case for the application of specific jurisdiction is when the out of state defendant causes injury to plaintiff in his or her home state and the suit is brought there. That is because the state has a " 'manifest interest' in

---

[21] Professor Marc Galanter has reported that trials nationwide accounted for only 1.8 percent of dispositions in civil cases in 2002, down from 11.5 percent in 1962. (See Galanter, *The Vanishing Trial: An Examination of Trials and Related Matters in Federal and State Courts* (2004) 1 J. Empirical Legal Studies 459, 462-463.) BMS has presented no data suggesting that the likelihood of trials in "big pharma" cases in California like this one approaches the national average as it existed in 2002 or today.

providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors" (*Burger King*, *supra*, 471 U.S. at p. 473), as well as a special interest in deterring wrongful conduct within its boundaries. (See, e.g., *Keeton, supra*, 465 U.S. at p. 776.) Because the RPI are not California residents and were not injured here, those state interests are diminished with respect to them.

But those state interests apply with full force to the dozens, if not hundreds, of California plaintiffs who are part of this suit. BMS would have us analyze its motion to quash as if those California plaintiffs play no role in the reasonableness analysis. They would also have us ignore the presence in this suit of co-defendant McKesson, which is based in San Francisco and which distributes Plavix for BMS. This is wrong.

It is true that, for purposes of determining minimum contacts, it is the contact of the defendant with the forum, and not that of the plaintiffs or co-defendants, which is paramount. (*Walden*, *supra*, 134 S.Ct. at p. 1122-1123; *Vons*, *supra*, 14 Cal.4th at pp. 457-458.) But when examining the question of reasonableness, it is entirely appropriate to consider the convenience to other actors in this drama, meaning California resident plaintiffs and California-based co-defendant McKesson, of litigating claims with the RPI together in one action here when evaluating California's interest in providing a forum for this dispute. (See *Burger King*, *supra*, 471 U.S. at p. 473.) And because the claims of the California plaintiffs are the same as the claims of the RPI, and because BMS has sold many tens of millions of Plavix pills to California residents, California has an interest, if not as strong an interest, in deterring dangerous conduct with respect to the RPI. BMS has not shown otherwise.

3. *Plaintiffs Have Demonstrated Interest In San Francisco as a Convenient and Effective Forum*

Plaintiffs' counsel in this matter hale from New York, California and Washington D.C. They have decided to bring these actions in California, they say, because a plurality of the plaintiffs in the original group of 659 are California residents. Further, they argue, but without providing competent evidence, California provides a forum in which they can sue both BMS and McKesson in the same case or cases. Be that as it may, plainly

37

plaintiffs' position is that the San Francisco Superior Court provides a convenient and effective forum. Given this assertion, we see no reason why they should not be allowed to proceed here, absent a jurisdictional or other compelling reason to the contrary. BMS has not provided one.

### 4. *Judicial Economy*

BMS has made no attempt to demonstrate that judicial economy would not be served by allowing these cases to go forward here. Nor could it. While there will undoubtedly be an incremental burden on the superior court in managing the RPI cases along with those of the California resident plaintiffs, that burden pales in comparison with requiring judges in 33 states all to become involved in the discovery, motion, and trial practice that may be necessary to resolve these cases. Indeed, it pales in comparison with the incremental burden of asking the trial court just to coordinate its cases with those in multiple other jurisdictions so that, for example, the same discovery issues are not litigated and relitigated time and again, such as because of protective orders regarding confidentiality adopted at BMS's request.

Further, allowing these cases to go forward here will benefit not only all plaintiffs and the courts, but defendant. It is difficult to see how it would be more efficient for BMS to litigate the same issues in multiple fora throughout the country. To the extent that the RPI would be discouraged from suing BMS in many states where no "critical mass" exists to support a common effort against BMS, that possibility does not weigh in favor of granting BMS's motion.[22] Be that as it may, BMS has not shown how judicial economy would be served by granting its motion to quash.

### III. *Pendent Personal Jurisdiction*

The RPI mention, but make no effort to develop, an argument pertaining to "pendent personal jurisdiction." Amici for the RPI, Consumer Attorneys of California and American Association for Justice, develop that theory through discussion of such cases as *Action Embroidery Corp. v. Atlantic Embroidery, Inc.* (9th Cir. 2004) 368 F.3d

---

[22] See footnote 20, *ante*.

1174 (*Action Embroidery*). A review of those cases makes clear that "pendent personal jurisdiction" is a federal common law doctrine developed to permit jurisdiction over non-resident defendants with respect to state law claims brought under the federal courts' discretionary supplemental jurisdiction. It was developed because some federal law claims, such as violations of the federal antitrust laws, may be brought in any federal district court (subject to venue considerations). However, related state law claims "aris[ing] out of the same nucleus of operative facts" require a showing of appropriate personal jurisdiction under the laws of the state where such state law claims were brought. To avoid piecemeal litigation of claims brought by the same plaintiff against the same defendant, this doctrine was developed.

Contrary to the arguments of amici, "pendent personal jurisdiction" has no bearing on the analysis of whether claims by non-resident plaintiffs, that is, different plaintiffs, may proceed with those of resident plaintiffs. However, the policy reason at the heart of pendent personal jurisdiction is equally applicable here: As Judge William Fletcher wrote in *Action Embroidery*: "When a defendant must appear in a forum to defend against one claim, it is often reasonable to compel that defendant to answer other claims in the same suit arising out of a common nucleus of operative facts. We believe that judicial economy, avoidance of piecemeal litigation, and overall convenience of the parties is best served by adopting this doctrine." (*Action Embroidery, supra*, 368 F.3d at p. 1181.) While pendent personal jurisdiction has no application to the issues before us, the policy behind it of encouraging judicial economy, avoiding piecemeal litigation, and encouraging convenience of the parties applies here with equal force.

## DISPOSITION

For the foregoing reasons, the trial court properly denied BMS's motion to quash service of the summons regarding the RPI complaints.  The order to show cause is DISCHARGED.  The petition is denied.

<br>

_____
Brick, J.*

We concur:

_____
Kline, P.J.

_____
Richman, J.

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court:  Superior Court of San Francisco County

Trial Judge:  Hon. John E. Munter

| | |
|---|---|
| Attorneys for Petitioner | Arnold & Porter<br>Sean M. SeLegue<br>Sharon D. Mayo<br>Jeremy McLaughlin<br>Steven G. Reade<br>Maurice A. Letter |
| Attorney for Amicus Curiae Chamber<br>of Commerce of the United States of America<br>in support of Petitioner | Donald M. Falk |
| Attorneys for Real Parties in Interest<br>Bracy Anderson, et al. | Napoli Bern Ripka Shkolnik, LLP<br>Hunter J. Shkolnik<br>Jessica Y. Lee<br>Shayna E. Sacks |
| Attorneys for Amicus Curiae American<br>Association for Justice in support of Real<br>Parties in Interest | J. Burton LeBlanc<br><br>Andrus Anderson LLP<br>Lori E. Andrus<br>Jenny Lee Anderson<br><br>Law Offices of Collyn A. Peddie<br>Collyn A. Peddie |
| Attorney for Amicus Curiae Consumer<br>Attorneys of California in support of<br>Real Parties in Interest | Robbins Geller Rudman &<br>    Dowd LLP<br>Kevin K. Green |